[No. B207595. Second Dist., Div. Six. Mar. 27, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
TODD WARREN FISHER, Defendant and Appellant.

COUNSEL

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul R. Roadarmel, Jr., and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COFFEE, J.—Todd Warren Fisher, a mentally disordered offender (MDO), appeals from an order authorizing Atascadero State Hospital (ASH) to forcibly administer psychotropic medications during his treatment. Appellant contends that his due process and statutory rights were violated by the order because he did not personally waive his right to be present for the hearing and was not advised of a right to a jury trial. He also contends that the order was not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant pleaded guilty to forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)) and was sentenced to three years in state prison. Upon release on parole, he was transferred to ASH pursuant to Penal Code section 2962 as an MDO. After an incident with a staff member, he was returned to prison for 18 months. He was then transferred back to ASH in October of 2007. Two months into this second period at ASH, the medical director requested authority to involuntarily administer psychotropic medication to appellant. The request was supported by a psychiatric evaluation signed by ASH staff psychiatrist Oghenesume Umugbe, M.D., as well as the medical director of ASH.

According to the December 2007 evaluation, appellant had been admitted two months earlier and was diagnosed as schizophrenic and polysubstance dependent with pedophilia not otherwise specified and antisocial personality disorder. Appellant was dangerous. Administration of medication was medically appropriate, likely to render him not dangerous and the least intrusive means of achieving that result. Specifically, appellant had stated he was very dangerous and said, " '[T]he last dude I fought, I hurt him bad.' " He

believed he was married to God, could control people's minds and could predict the future. On one occasion he took papers from a staff member, threw them on the floor, became physically threatening and had to be restrained. He shouted at a janitor in an angry tone and approached staff members saying, " 'I picture you swinging from ropes.' " He also exceeded his allotted time on the telephone and threatened force when "redirected." He said, " 'You will have to use force each time to give me psychotropic medications,' " and " 'I will never accept[] psychotropic medications voluntarily.' "

The prosecution moved for a judicial determination authorizing involuntary psychotropic medication pursuant to Welfare and Institutions Code section 5300[1] and *In re Qawi* (2004) 32 Cal.4th 1 [7 Cal.Rptr.3d 780, 81 P.3d 224]. On January 28, 2008, the court appointed the public defender to represent appellant. Appellant was not present and the court continued the matter to give counsel an opportunity to interview his client. Counsel appeared twice more to obtain continuances. Appellant was not present. On the first occasion, counsel indicated that the People needed to arrange witnesses. On the second occasion, counsel stated that he would "do a transport order" and "call the hospital, and if [appellant] wants to simply submit it, then we'll do that . . . ."

The matter came on for court hearing on February 25, 2008. Appellant was not present. His counsel stated, "He is in Atascadero. I'm about to issue the order to bring him down." "When I talked to him today to explain that I didn't get the order, he said—at one point in the conversation, he said he wanted to be here. At another—at the initial part of the conversation, he did not make that request." By stipulation, the court heard the testimony of Dr. Umugbe, received his evaluation in evidence without objection and continued the matter to allow appellant and his counsel to confer and decide whether appellant wished to appear and testify.

Dr. Umugbe attested to the truth of his evaluation at the time it was written more than two months earlier. On cross-examination, he stated that after getting to know appellant better, it was his opinion that appellant did not suffer from schizophrenia but that he suffered from a mood disorder not otherwise specified. Appellant had been taking Depakote since December when a panel approved temporary involuntary medication pending court hearing. Initially, he fought the medication and it was injected intramuscularly. However, he was now taking it in pill form, under protest, but without resistance. He was responding to the medication and his behavior had

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

improved. Dr. Umugbe did not testify about the specific conduct described in his written evaluation, but did comment that before appellant was medicated, "He was beginning to be physically very aggressive, and we had to call for help to try to contain him, and [he] had to be going on restraint, full bed restraint, and sometimes positive restraint." The matter was continued for two days so that appellant's counsel could describe the testimony to appellant and appellant could decide whether he wished to appear.

Appellant's counsel appeared two days later and requested a further continuance, stating that he had been ill, and that when he had called appellant, appellant could not come to the telephone. The court continued the matter for two more days. Counsel appeared and reported that "[appellant] said he would like to address the Court. If you could give us a date, I'll prepare a transportation order. . . . [¶] I was trying to bring it with me right now, but I just didn't finish it. [¶] . . . [¶] I'll have it finished this afternoon." No evidence or argument was offered at these interim appearances.

The hearing resumed on March 24, 2008. Appellant was present and testified. He had been at ASH five months. He said he was still taking Depakote under protest but without resistance. He denied having a mental illness. He admitted having done something "violent" when he smacked a newspaper out of the hands of a staff person, but said the man had provoked him earlier that day and that he did not assault or threaten the man. He expressed concern that the medication could cause heart disease or death. He said he was present at ASH for a hearing regarding involuntary medication, but he was not allowed to present witnesses, make a statement or question the psychiatrist.

On cross-examination, appellant said that he had been returned to prison 23 months earlier after telling a female janitor that he had not "been with a woman in quite a long time," and asking her if that made her uncomfortable. When asked if he masturbated in her presence, appellant replied, "I don't think so. I wasn't. I don't think she could have." She complained about the incident and his parole officer was called to the unit. Appellant admitted that he kicked a door out of frustration.

At the close of evidence, the court granted the prosecution's petition, finding that the criteria for involuntary administration of psychotropic medication under section 5300 were satisfied.

## DISCUSSION

■ The right to refuse necessary medical treatment, including antipsychotic drugs, is a liberty interest that is protected by the due process clause of

the Fifth Amendment to the United States Constitution. (*Sell v. United States* (2003) 539 U.S. 166, 177 [156 L.Ed.2d 197, 123 S.Ct. 2174].) The right of a competent adult to refuse antipsychotic drugs is also protected by the common law and article I, section 1 of the California Constitution. (*In re Qawi, supra*, 32 Cal.4th at p. 17; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1318 [271 Cal.Rptr. 199].)

■ The rights of a person who has been committed to involuntary mental health treatment as an MDO are the same as those of an involuntary mental health patient under the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.). (Pen. Code, § 2972, subd. (g).) MDO commitment alone does not mean that an individual is incompetent to participate in his or her own medical decisions. (*In re Qawi, supra*, 32 Cal.4th at p. 24.) "[T]he coercive administration of [antipsychotic] medication, with its potentially serious side effects, imposes a significant additional burden on the MDO's liberty interest." (*Id.* at p. 15, fn. 4.) In the case of an MDO, this liberty interest may be restricted to accommodate the state's interest in protecting the public and providing mental health treatment for offenders who are dangerous as a result of severe mental illness. (Pen. Code, § 2960; *Sell v. United States, supra*, 539 U.S. at pp. 178–179.)

Therefore, like an LPS patient, the MDO's right to refuse antipsychotic drugs is qualified and may be overcome in nonemergency situations by a judicial determination either that the person is incompetent or that he or she is dangerous within the meaning of section 5300: "[A]n MDO can be compelled to be treated with antipsychotic medication under the following nonemergency circumstances: (1) he is determined *by a court* to be incompetent to refuse medical treatment; (2) the MDO is determined *by a court* to be a danger to others within the meaning of Welfare and Institutions Code section 5300." (*In re Qawi, supra*, 32 Cal.4th at p. 27, italics added.)

### Personal Waiver of Presence at Hearing Required

■ An MDO proceeding is civil, rather than criminal, in nature. (*People v. Robinson* (1998) 63 Cal.App.4th 348, 350 [74 Cal.Rptr.2d 52].) It does not implicate all of the constitutional and procedural safeguards afforded to criminal defendants. (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1407 [122 Cal.Rptr.2d 384].) Nevertheless, in civil commitment proceedings, due process guarantees the right to be present during the presentation of evidence absent personal waiver or demonstrated inability to attend. (*In re Watson* (1979) 91 Cal.App.3d 455, 461–462 [154 Cal.Rptr. 151] [proceeding to involuntarily commit person with dangerous developmental disability under former § 6500.1].) An attorney's authority to control procedural matters in a civil case (*People v. Otis* (1999) 70 Cal.App.4th 1174 [83 Cal.Rptr.2d 326]

[counsel may waive MDO's statutory right to jury]) does not authorize relinquishment of substantial rights, such as the right to be present, without the client's consent (*Linsk v. Linsk* (1969) 70 Cal.2d 272, 278 [74 Cal.Rptr. 544, 449 P.2d 760]). Appellant's constitutional right to a fair hearing was violated here because he did not personally waive his right to be present and was not unable to attend the hearing.

■ In *In re Watson*, the due process provisions of the federal and state Constitutions guaranteed a developmentally disabled person the right to be personally present at an involuntary commitment hearing, absent personal waiver of the right to be present or demonstrated inability to attend. (*In re Watson, supra*, 91 Cal.App.3d at p. 462.) The *In re Watson* court reasoned that such a person faces substantial loss of liberty, and "the practice of dispensing with the presence of the alleged dangerously mentally retarded person suggests a predetermination of the mental condition. Such practice is unacceptable, for it effectively denies the person the independent judgment of the judge at the commitment hearing. If the person is so mentally retarded as to be unable to comprehend the advisal of the right to be present and other rights incident to a fair hearing, the record should affirmatively reflect that fact." (*Ibid.*) The same concerns apply here, where the MDO faces substantial loss of liberty resulting from involuntary administration of medication. (*In re Qawi, supra*, 32 Cal.4th at p. 15, fn. 4.)

*Harmless Error*

■ The deprivation of appellant's right to be present was, however, harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) In civil commitment proceedings, we use the *Chapman* test to review federal constitutional error. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 [124 Cal.Rptr.2d 186, 52 P.3d 116] [failure to instruct on predatory act in proceeding to commit sexually violent predator was harmless beyond a reasonable doubt].) We use the *Watson* harmless error test to review deprivation of statutory rights. (*People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1276 [123 Cal.Rptr.2d 535] [deprivation of MDO's statutory right to jury]; *People v. Williams* (2003) 110 Cal.App.4th 1577 [2 Cal.Rptr.3d 890] [deprivation of MDO's statutory right to self-representation].) Unlike the purely statutory rights to jury and counsel in *Cosgrove* and *Williams*, an MDO's right to be present implicates the Fourteenth Amendment to the federal Constitution. (*People v. Watson, supra*, 91 Cal.App.3d at p. 460.) We therefore apply the *Chapman* test.

■ Appellant's absence from court on the day that Dr. Umugbe testified was harmless beyond a reasonable doubt. Appellant's counsel thoroughly cross-examined Dr. Umugbe, whose testimony was compelling. Dr. Umugbe

testified that appellant was physically aggressive before Depakote was administered, and that appellant was responding to the medication. Appellant, thereafter present, was given a full and fair opportunity to rebut the testimony. He admitted that he had done something violent. His expressed concerns about risks of the medication were contradicted by Dr. Umugbe's professional medical opinion that administration of Depakote was medically appropriate. We are satisfied that appellant's absence was harmless beyond a reasonable doubt.

### No Right to Jury Trial

A person subject to MDO proceedings has a statutory right to trial on the initial commitment decision, and on each decision to extend commitment. (Pen. Code, §§ 2966, subd. (b), 2972.) No California court has recognized a right to jury trial on the question of involuntary psychotropic medication during MDO or LPS commitment.

It is settled that there is no federal constitutional right to a jury on the question whether to administer involuntary antipsychotic medication. (*Washington v. Harper* (1990) 494 U.S. 210 [108 L.Ed.2d 178, 110 S.Ct. 1028] [decision by independent medical board to authorize involuntary administration of psychotropic medication satisfied federal substantive and procedural due process guarantees].) Similarly, the California Supreme Court has held that the decision to administer antipsychotic medication may be made by "the court." (*In re Qawi, supra,* 32 Cal.4th at p. 27.)

Appellant contends that he had a statutory right to a jury because an MDO is entitled to the same rights as an LPS patient, and section 5302 of the LPS Act[2] grants a right to a jury in a section 5300 hearing. We disagree.

An MDO has the same substantive rights as an LPS patient, but LPS procedures may require "reasonable translation of LPS rights into the context of the MDO Act." (*In re Qawi, supra,* 32 Cal.4th at p. 28, fn. 7 [different timeframes for determining "recent" dangerousness].) The *Qawi* court held that an MDO may be forced to submit to antipsychotic drugs if he or she is a danger to others "*within the meaning of* Welfare and Institutions Code section 5300" (*In re Qawi,* at p. 27, italics added), not *pursuant to the procedures of* section 5300. In the LPS context, the section 5300 dangerousness determination authorizes involuntary commitment for 180 days. Thus, the Legislature has afforded the LPS patient a right to a jury. In the MDO context, the patient

---

[2] Section 5302 provides in LPS proceedings, "At the time of filing of a petition for postcertification treatment the court shall advise the person named in the petition of his right to be represented by an attorney and of his right to demand a jury trial."

has already been involuntarily committed by jury and the section 5300 determination only authorizes involuntary administration of antipsychotic medication. There is no right to a jury.

The absence of a jury trial is consistent with treatment of LPS conservatees and state prison inmates, neither of whom have a right to jury trial on the question of forcible administration of antipsychotic drugs. A proposed conservatee under the LPS Act has the right to a jury trial on the issue of whether a conservator should be appointed based on a grave disability, and in subsequent proceedings, to reestablish conservatorship. (§ 5350, subd. (d).) But once conservatorship is established, antipsychotic drugs may be forcibly administered based upon a judicial determination alone. (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 541 [223 Cal.Rptr. 746].) "LPS conservatees have a right to refuse involuntary long-term psychotropic medication absent a judicial determination of their incompetency to do so." (*Id.* at p. 536.) Similarly, state prison inmates are afforded a jury trial before incarceration, but, once incarcerated, they may be subjected to forcible administration of antipsychotic drugs based upon a judicial determination. (*Id.* at p. 542; see also *Washington v. Harper, supra*, 494 U.S. 210.)

### Substantial Evidence

We review an order authorizing involuntary administration of antipsychotic medication for substantial evidence. (*People v. O'Dell* (2005) 126 Cal.App.4th 562, 570 [23 Cal.Rptr.3d 902].) In the case of the MDO, the order must be supported by evidence that either the MDO is incompetent to refuse medical treatment or that the MDO is a danger to others within the meaning of section 5300. (*In re Qawi, supra*, 32 Cal.4th at p. 27.) Section 5300 requires a particularized showing that the person is a demonstrated danger and that he or she was recently dangerous. (*In re Qawi*, at p. 21.) In the case of an MDO, the commitment offense may establish demonstrated dangerousness and recent dangerousness consists of "violent or threatening acts specified in section 5300 within the year prior to the commitment or recommitment." (*In re Qawi*, at p. 28, fn. 7.)

Substantial evidence supports the trial court's finding that appellant was a danger to others within the meaning of section 5300. The staff psychiatrist diagnosed appellant as suffering from a mood disorder not otherwise specified. The court received evidence, without objection, that during his commitment appellant threatened physical violence, masturbated in front of female

staff, and took papers from staff and threw them on the floor, becoming physically threatening. Appellant disagreed with his diagnosis and denied being violent, but admitted that he hit a newspaper that was being read by a staff member who had previously provoked him.

The order is affirmed.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied April 22, 2009, and appellant's petition for review by the Supreme Court was denied July 8, 2009, S172789.